## ÆTNA LIFE INS. CO. v. HUB HOSIERY MILLS et al.

### No. 4368.

United States Court of Appeals
First Circuit.

Nov. 8, 1948.

---

548

Bailey Aldrich, of Boston, Mass. (Choate, Hall & Stewart, of Boston, Mass., on the brief), for appellant.

Albert L. Bourgeois, of Lowell, Mass. (Bourgeois & Bourgeois, of Lowell, Mass., on the brief), for appellee Alfred J. Traverse.

Before MAGRUDER, Chief Judge, GOODRICH, (by special assignment), and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a judgment entered for the defendants in an action brought for the cancellation and surrender of a policy of insurance issued by the plaintiff on the life of the defendant Traverse, paid for by the defendant Hub Hosiery Mills (the beneficiary named in the policy), and assigned to the defendant Union National Bank as collateral security for a loan. Federal jurisdiction rests upon diversity of citizenship and amount in controversy.

The following facts are not in dispute. On August 13, 1946, Traverse, an executive officer of Hub Hosiery Mills, made application to the plaintiff for term insurance in the face amount of $40,000. In his application Traverse stated that he had never sought medical advice. for nor suffered from any of a number of enumerated diseases and ailments, or any other disease,

illness or injury not mentioned; that no one had ever claimed to have found albumin, casts, pus, blood or sugar in his urine; that he had never been an inmate of any hospital or sanitarium, and that he had last consulted a physician in August, 1941, for an infected foot, from which "there are no present residuals." At that time he was examined by the plaintiff's local medical examiner who found nothing physically wrong with him and found neither albumin nor sugar in his urine. The medical examiner submitted his report to the plaintiff at its home office with a specimen of Traverse's urine, an analysis of which in the plaintiff's laboratory disclosed neither albumin nor sugar.

On the basis of the foregoing the plaintiff issued a policy in the form applied for and on August 23, 1946, that policy was delivered to another executive officer of Hub Hosiery Mills, who at the time was attending a meeting with the former owners of that corporation consummating a transaction whereby he and Traverse acquired the entire interest in it. The corporation as the named beneficiary and owner of the policy paid the first premium on it at the time of delivery, and immediately upon delivery it was assigned to the defendant bank as collateral security for a loan.

Traverse was not present at the meeting at which he became one of the two new owners of the Hub Hosiery Mills, albeit a minority stockholder, and at which the policy of insurance here involved was delivered. Instead he was in a hospital which he had entered the day before for the purpose of having a "check-up" on his health. The reason for his having a check made on his health instead of attending the meeting, which must have been important to him, is as follows:

On June 26, 1946, Traverse had had an attack of "chills" while at work in his yard. He lay down on a couch in his house for a short time without undressing, and then feeling better he resumed his out-door work. On that occasion his wife, without his knowledge, consulted a physician over the telephone about his condition. The physician did not call, however, and apparently did not prescribe any treatment. Then on August 22, 1946, the day before the policy was delivered, Traverse experienced another "chill" while at work at the Hosiery Mills. He went home and at his wife's request summoned a physician who called to examine him. The physician, being unable to determine the cause of the "chill", suggested a three day hospital check-up, and about 2 p. m. on the same day Traverse entered a local hospital where he submitted to a variety of tests in an effort to diagnose his condition. A test for sugar in his urine was made early in the morning of August 23, which was positive. Upon discovering that Traverse had eaten a pound of candy the afternoon or evening before, a repeat test was immediately made, which was negative, and no urine or other test for sugar was made during the remainder of his stay in the hospital. Without any medication Traverse's temperature decreased progressively from 100 degrees on admission to 98.6 degrees at 5 a. m. on August 23, where it remained thereafter. Traverse was discharged on August 24, the hospital record showing his condition at that time to be "well", and the final diagnosis to be "No disease". Traverse did not notify the plaintiff of his "chill" on August 22, or of his entry into the hospital, nor did his fellow executive tell the agent of the plaintiff who delivered the policy anything about either Traverse's physical condition or whereabouts at the time of delivery, although he knew of Traverse's "chill" and also of his visit to the hospital.

Some time after the delivery of the policy the plaintiff learned of Traverse's hospitalization and requested Traverse to undergo a blood test for sugar tolerance. Traverse complied and the test indicated that he had diabetes. He has remained a mild or borderline diabetic ever since.

There is and can be no question that Massachusetts law controls and that the applicable statute, Mass.Gen.Laws (Ter.Ed.) Ch. 175, § 186, provides: "No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased

the risk of loss." Neither is it nor can it be disputed that the application contained the provision that "No * * * policy shall become effective until the first premium upon it is paid during the good health of the insured." Nor is it contended that the court below misunderstood the law. The plaintiff-appellant's contention is that the findings made are not supported by the evidence. It says specifically that the court below fell into clear error in finding as ultimate facts[1] (1) that Traverse's failure to notify the plaintiff of what transpired on August 22, although amounting to misrepresentations of material facts in the application for insurance, which speaks as of the date of delivery of the policy issued pursuant thereto, where neither misrepresentations made with actual intent to deceive, nor misrepresentations of matters which increased the risk of loss, and (2) that Traverse had not been shown to have had diabetes on or prior to August 23, 1946, the date of delivery of the policy. We do not agree with this challenge to the findings.

Insurance contracts are not to be construed with absolute literalness. They are to be construed as ordinary persons in the situation of the contracting parties would construe them, and so construed there can be no doubt, indeed the plaintiff-appellant concedes, that the representations as to past health contained in the application do not have reference to every temporary and minor deviation from complete physical well being, such as a cold in the head or a splinter in the finger, although, of course, a cold in the head can have serious pulmonary complications and a splinter in the finger can be the cause of tetanus or serious infection.

So construed, and assuming that silence with respect to illness or injury occurring between the date of application for a policy of insurance and the date of delivery and payment of the first premium on the policy issued thereon is tantamount to a false statement in the application,[2] we cannot say that the insured's failure to report the chill which he sustained on August 22

amounted to a misrepresentation of a material fact made with an actual intent to deceive, or to a misrepresentation of a matter which increased the risk of loss. A chill is not infrequently the precursor or first symptom of a common cold, and since the chill in question was only of short duration we see no reason why Traverse should have regarded it as serious enough to warrant report to the insurance company, particularly in view of the fact that it apparently was not followed by any serious after effects.

The most that can be said is that Traverse was under an obligation to report any material deviation from good health occurring between the date of the application for insurance and the date of delivery and payment of the first premium on the policy, and so far as he knew, except for a minor chill, he was in good health during that time. Indeed, except for the chill, he must have considered himself in excellent health during that period since no determination of disease was made while he was in the hospital undergoing a thorough examination and he was discharged as "Well" with a diagnosis of "No disease". A thorough "check-up" to determine health, even if undertaken because of doubt on that score, cannot be said to be tantamount to knowledge of a state of ill health.

Nor did the first positive analysis of Traverse's urine for sugar require report. His doctor, and we may assume that Traverse also, had good reason to believe that that test was invalidated by the pound of candy eaten before it was made, and that the second test, which was negative, made immediately thereafter, accurately portrayed the true situation. Under these circumstances there was every reason to believe that the first test proved nothing. We cannot read into the contract any obligation to report the results of a test which for good reason the doctor who ordered it made believed valueless.

We think like principles of construction must be applied in interpreting Traverse's statement in the application that

---

[1] The case was tried without a jury.
[2] It is not contended that Traverse made any statement in his application which was not true to the best of his knowledge and belief when he made it.

he had never "been an inmate of any hospital". Literally it may have been tantamount to a falsehood in the application to permit the plaintiff to deliver its policy without disclosure of Traverse's entry into the hospital for a "check-up". But we think the question in the application with respect to hospitalization might well be construed as only requiring disclosure of any entry into a hospital for the treatment of some illness, injury or disease, not entry merely for diagnostic purposes. In any event the court below was warranted in considering that the failure to disclose a visit to the hospital for a mere medical check-up did not amount to a misrepresentation of a material matter made with intent to deceive, and certainly it was not a misrepresentation with respect to a matter which increased the insurer's risk of loss.

The question of Traverse's actual good health on August 23, when the policy was delivered and the premium on it paid, remains to be considered.

The appellant contends that the District Court's finding that "Traverse has not been shown to have had diabetes prior to or at the time of the delivery of the policy on August 23, 1946," cannot stand in the face of the undisputed testimony of its medical expert that the blood test for sugar tolerance (a far more accurate test for diabetes than a test of urine for sugar) made on September 5, indicated that Traverse "probably had diabetes" thirteen days before on August 23.

The argument is fallacious. Disregarding metaphysical speculations with respect to living bodies carrying within themselves from birth, or even conception, the seeds of their own ultimate decay, there must be a time of onset, or of first discoverability, of every disease or illness. When this time is may be capable of relatively exact determination or it may not. The testimony is that undoubtedly it was not in the case of Traverse's diabetes. He no doubt was suffering from that disease for some period of time before September 5, 1946, but how long that period may have been is in the nature of things incapable of exact determination. Without his or any one else knowing it Traverse may have had the disease for weeks or even months, or he may have had it only a matter of days before its presence was discovered. All the medical experts who testified agreed on this. And, of course, it is conceivable that by coincidence Traverse's diabetes first became discoverable only a matter of hours or theoretically even minutes, before the blood test of September 5 was made. There must have been some moment in time when the disease first could be found to exist in his system.

Under these circumstances we cannot say that it was "clearly erroneous" Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., for the court below not to have found in accordance with the testimony of the plaintiff's expert witness. The mere fact that that expert expressed his opinion in terms of probability, and hence in terms strong enough to support a finding in accordance with it, does not mean that such a finding is compelled as a matter of law. The court below was not bound to regard the statement of the plaintiff's expert that "in my opinion he probably had diabetes" on the critical date in vacuo. It not only could, but properly should consider that statement in the light of the other testimony in the case which indicated the impossibility of determining with anythng approaching mathematical precision even the approximate date of the actual onset of Traverse's diabetes. In this situation the District Court was warranted in concluding that the testimony of the plaintiff's expert witness, while stated strongly enough to support a finding, was not sufficiently convincing in spite of the terms in which it was couched to sustain the plaintiff's burden of persuasion on the issue of Traverse's actual bad health on the critical date. Nor does the fact that tests of Traverse's urine made after September 5, 1946, have never shown the presence of sugar, even though it is conceded that after that date he in fact had diabetes, require a finding that he had that disease on August 23, or prior thereto. It shows only that unknown to any one he may have had the disease then in spite of the tests made at the hospital, not, of course, that he must have had it when those tests were made. This fact, like the fact that Traverse failed to call the medical specialist who is now treat-

ing him to testify as an expert witness in his behalf, bear only on the weight to be accorded to the evidence presented on behalf of the defendants.

But the plaintiff argues that the memorandum opinion of the court below indicates that that court in fact did believe the testimony of its expert witness but failed to find in accordance therewith because it erroneously believed that testimony too weak as a matter of law to support a finding. This argument rests upon the following paragraph in the District Court's opinion [74 F.Supp. 602]: "The complainant's expert on diabetes testified that a sugar tolerance test is the true, and only conclusive, way to discover diabetes. He further testified that in many cases, a person who has no symptoms and appears to be in good health, has been found by this test to have diabetes. However, no evidence was presented to show how long a person must have the disease in order for it to be disclosed by such a test. Although complainant's expert testified that a person in whom the existence of diabetes is revealed by a sugar tolerance test probably had the disease for a period of several weeks prior to the test, he was unwilling to give a categorical opinion on that point. His opinion, therefore, that Traverse had diabetes on August 23, 1946, was inconclusive. In the absence of more definite evidence on this point, which is the crux of the case, in so far as this question of good health is concerned, I am unable to find that Traverse was not in good health on August 23, 1946."

The argument is that the foregoing shows that the court below failed to recognize that evidence of probability is strong enough as a matter of law to support a finding of fact, whereas evidence of mere possibility is not. It is said that this is indicated because although the expert's testimony was of a probability, the court below characterized it as not "categorical" and "inconclusive", and then said that for these reasons it was "unable" to find that Traverse was not in good health on the critical date.

We are loath to believe that the court below ignored so elementary a principle of law as the one upon which the argument rests. Nor do we think that it did. In its context we think that the District Court used the word "unable" only to indicate that it was not persuaded.

The judgment of the District Court is affirmed.